# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| H. LEIGH SHOCRYLAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 06-40278-FDS |
| WORCESTER STATE COLLEGE, ) | |
| DAVID CARUSO, ) | |
| WILLIAM WHITE, ) | |
| LINDA LARRIVEE, and ) | |
| LEE CORDARO, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil action arising from the dismissal of plaintiff Leigh Shocrylas from the graduate speech language pathology program at Worcester State College in January 2006. Defendants David Caruso, William White, Linda Larrivee, and Lee Cordaro are faculty members and officials at WSC. In substance, Shocrylas contends that she received poor grades in a clinical program because her instructors and their supervisors were motivated by personal animus, not professional judgment, and that she was dismissed from the program in violation of the program manual. She contends, among other things, that defendants violated her right to due process of law under the Fourteenth Amendment to the United States Constitution.

The counts against WSC were dismissed in October 2007 on the basis of sovereign immunity. The remaining defendants have now moved for summary judgment on the remaining counts. For the reasons set forth below, the motion will be granted.

**I.     Factual Background**

The facts are stated in the light most favorable to the plaintiff unless otherwise noted.

Worcester State College is a college in Worcester, Massachusetts, established by state law. It offers a graduate-level program in speech language pathology ("SLP"). David Caruso is the Vice-President of Academic Affairs at WSC. William White is the Dean of Graduate and Continuing Education. Linda Larrivee is the Chair of the Department of Communication Sciences and Disorders. Lee Cordaro is a Clinic Supervisor in the SLP program.

H. Leigh Shocrylas is a resident of Southborough, Massachusetts. In 2003, she applied to the graduate program in SLP at WSC. At the time of her application, she was 44 years old.

Larrivee served on the admissions committee for the program. According to Shocrylas, Larrivee told her that a geography course that she had taken to fulfill the physical science prerequisite was insufficient. However, according to Shocrylas, this contradicted what another school official had told her, and the college had admitted other students in similar circumstances. Shocrylas contends that Larrivee recommended against admitting her to the program, and accordingly her application was rejected. Another faculty member, however, intervened and asked the admissions committee to reconsider the decision.

As part of the reconsideration process, Shocrylas was given a second interview. According to Shocrylas, Larrivee was "unable to mask her hostility" to her during the interview. She introduced her as "Helen Shocrylas, who for some reason wants to be called Leigh," and at one point asked her, "Exactly how old *are* you?" Larrivee also "slammed her hand down on the desk" in front of her and told her "no one is going to be holding your goddam hand." Shocrylas was nonetheless admitted to the program.

Shocrylas did well in her classroom work over the next two years, earning mostly As. She did not receive a grade lower than B+ in any classroom course, except for the three courses taught by Larrivee, in which she earned two Bs and one B-.[1]

In order to graduate with a degree in SLP, a student must complete 375 clinical practice hours. Clinical students are supervised by Clinic Supervisors, who meet with students to develop a treatment plan for each patient, observe patient sessions, provide verbal and written feedback, and evaluate student performance.

In the fall 2005 semester, Shocrylas enrolled in the clinical practicum course, which includes both classroom instruction and work with one or two patients. Shocrylas elected to take two patients simultaneously. She was assigned an adult with a head injury ("KOS") and a child with autism ("MAS").[2] Lee Cordaro was assigned to be her Clinic Supervisor.

Shocrylas met with patients on Mondays and with Cordaro for an hour on Thursdays. She contends that the feedback she received from Cordaro was generally positive until, during one meeting, she questioned why Cordaro had recommended a prognosis change for KOS from "fair" to "good." After this incident, the feedback from Cordaro became much more negative. Shocrylas contends that Cordaro graded her unfairly because she resented her questioning of the change.[3]

---

[1] Shocrylas contends that Larrivee continued to be hostile to her after her admission, "even hanging up the phone on [her] when she called after her car broke down on the highway during a snowstorm." (Pl. Opp. Mem. at 12).

[2] For confidentiality reasons, the patients are identified by their initials only.

[3] Cordaro contends that she generally gave Shocrylas positive feedback for her empathy and ability to recognize the personal issues of the patients, but was critical of her listening and questioning skills and her ability to convey goals to the patients.

On November 11, 2005, Cordaro and Shocrylas met for her midterm review. Cordaro told Shocrylas that she was earning a failing grade as to KOS. According to Shocrylas, that came as a great surprise to her.

The SLP program at WSC uses an assessment framework called the Wisconsin Procedure for Appraisal of Clinical Competence ("WPACC") to grade clinical performance. Appendix M to the SLP Clinical Manual provides as follows:

> B. If a student earns a grade of C+ or lower on the midterm WPACC, after meeting with the case manager, the student will attend a departmental conference to discuss marginal clinical performance. The case manager, practicum instructor, clinic director, graduate advisor, and department chairperson will be present. Clinical performance, concerns, goals and plan for improvement will be discussed.
>
> C. Following the departmental conference, the student and case manager will incorporate adjustments and/or additions to the procedures outlined [in the previous section]. Modifications to this plan may also be made based on the student's clinical performance as the semester progresses.
>
> D. If the student achieves all of the goals outlined in the action plan, and receives a composite grade of B- or better on the final WPACC, the next practicum experience will be assigned. If the student does not achieve all of the goals outlined in the action plan, and receives a composite grade of C+ or lower, the clinical experience must be repeated with another client in the clinic in a subsequent semester. If the student fails a second clinical practicum experience, no additional practicum will be assigned.

Pursuant to the provisions of the Clinical Manual, a departmental conference was held on November 14 with Shocrylas, Cordaro, Ann Veneziano (another faculty member), Larrivee, and MaryAnn Power (Shocrylas's advisor). At the meeting, her performance was discussed; Shocrylas explained her surprise at her low grade and argued that her actual performance was much better than that reflected by the grade. It was decided that Veneziano and Cordaro would

jointly serve as Shocrylas's Clinic Supervisor for KOS, and that Cordaro and Kenneth Melnick (another faculty member) would jointly supervise her for MAS.

For the rest of the semester, Shocrylas had two meetings on Thursdays—one with the Clinic Supervisors for each patient.[4] At the end of the semester, Shocrylas received composite grades of C for MAS and C- for KOS. Both grades are "failing" grades within the meaning of the Clinical Manual. She earned an A for her classroom work, and received an overall composite grade of C+ for the semester.

Shocrylas contends that she had only three sessions with each patient after the intervention meeting. Nonetheless, her WPACC grade for KOS dropped drastically from a 9/10 on her midterm to a final grade of 4/10 on "utilizing planned teaching procedures." She contends that she never canceled a session with a patient, but was graded "unsatisfactory" for canceling a patient appointment. She also contends that Cordaro reduced her "listening and asking questions" score from 8/10 at the midterm to 1/10 in the final assessment, and reduced her "professional technical skills" score from 8/10 to 5/10.

The college notified Shocrylas that she had received failing grades and that she would be dismissed from the program. Shocrylas contends that her dismissal violated the terms of the Clinical Manual. Under the manual, she contends that when a student is assigned two patients in a semester, the student receives only one composite clinical grade; accordingly, if that composite grade is C+ or lower, the student should have the opportunity to have another clinical experience

---

[4] Melnick, Veneziano, and Cordaro contend that they repeatedly gave Shocrylas feedback and that she failed to implement it in her sessions with the patients.

in a subsequent semester. The college contends that she failed two clinical practicum experiences, and therefore was subject to dismissal.

Shocrylas went to see David Caruso, the Vice President of Academic Affairs, and complained that she had been treated unfairly. According to her, he ignored her complaints.[5]

Later the same day, Shocrylas met with William White, the dean for graduate education. One of White's responsibilities was to hear student appeals of individual course grades. He also served on the Graduate Council, which hears student appeals of dismissal from graduate programs. The Council consists of five faculty members and three administrators; it meets monthly during the academic year, but does not meet during the summer. Shocrylas contends that White's first response, when she told him that her instructors had graded her poorly due to personal bias, was to ask "who knows about this?"[6]

On January 17, 2006, Shocrylas sent letters to both Cordaro and White appealing both her individual grade and her dismissal from the program. On January 30, in response to her letter to Cordaro, Shocrylas had two meetings—one with Cordaro and Veneziano regarding her grade for KOS, and one with Cordaro and Melnick regarding her grade for MAS. The Assistant Vice-President for Academic Affairs, Annmarie Samar, attended both meetings as an observer. Shocrylas also brought her husband and a friend along to observe both meetings. At each

---

[5] Caruso contends that he told her that in order to appeal her grade, she needed to start with her instructor (Cordaro), then meet with her department chair (Larrivee), then with the Dean of Graduate and Continuing Education (White). If she was not satisfied with their responses, he explained, she could then appeal to him.

[6] White contends that he explained the appeal process to Shocrylas and advised her to appeal simultaneously both her individual grade and her dismissal from the SLP program.

meeting, Shocrylas presented arguments as to why her grades were unfair.[7]

On February 9, Shocrylas was notified by letter that her appeals were denied. She contends that the decisions were not made jointly, but rather that Cordaro unfairly dominated both decisions.

On February 14, Shocrylas sent a letter to Larrivee, the department chair, further appealing her grades. On February 27, she met with Larrivee and presented her view of the situation, as well as a written appeal. She also presented her with a file folder of clinical materials, including patient logs and therapy notes. Her husband and Samar were again present as observers.

On March 13, Larrivee informed Shocrylas by letter that her appeal was denied.[8] Shocrylas contends that Larrivee did not investigate or consider that her patients showed improvement as a result of the therapy sessions; did not review the materials that she provided; was hostile to her; and had already made up her mind prior to the meeting that she would be dismissed from the program.

On March 16, Shocrylas sent a letter to White, the dean of graduate education, further appealing her grades. On April 4, she met with White for several hours. Her husband and Samar

---

[7] According to defendants, she did not present evidence that her performance had been better than that reflected by the grade; instead, she blamed Cordaro for her bad grades. Melnick and Cordaro contend that after the meetings they discussed the matter and jointly decided to deny her appeal of her grade for MAS. Similarly, Cordaro and Veneziano contend that they discussed the matter and jointly decided to deny her appeal of her grade for KOS.

[8] Larrivee contends that after the meeting she reviewed the materials and talked to Cordaro, and concluded that the grades accurately reflected Shocrylas's performance.

were again present as observers.[9]  Shocrylas contends that White was hostile to her throughout the meeting, and indeed "fabricated a number of trumped-up allegations" against her.  (Pl. Opp. Mem. at 13).  She also contends that she did not have access to her WPACC assessments[10] or the videotapes of the therapy sessions, and that if she had been given copies before her appeals, it would have changed the outcome of the process.  She contends that the tapes show that she actually performed well and that the WPACC assessments demonstrate the unfairness of her grades.

On April 24, White notified Shocrylas by letter that he was denying her appeal.[11]  Shocrylas contends that he did not conduct a thorough review of her file.[12]  She also contends that he denied her appeal based solely on personal animus.[13]

---

[9] According to White, she spent much of the time blaming her clinical supervisors and did not take any responsibility for her poor performance or present evidence that her performance was better than as reflected in her grade.

[10] Defendants contend that it is WSC policy to discuss the WPACC factors and grades with students at mid-term and semester-end meetings, but not to provide students with copies of the WPACC written assessments.

[11] The Graduate Grade Appeal procedure set forth in the Graduate Student Handbook provides that if "within ten working days of the receipt" of an appeal request, "the Dean of Graduate and Continuing Education is unable to resolve the matter to the satisfaction of all parties, then either party may, within ten working days, file a written request to review the matter with the Academic Vice President." (Ex. 3).  Shocrylas interprets that provision as requiring that White provide a decision within 10 days of receipt of her letter.  She also contends that he deliberately manipulated the schedule so that the full Graduate Council could not hear the final appeal. (Pl. Opp. Mem. at 14).

[12] White contends that after the meeting he reviewed Shocrylas's entire academic record at WSC, and consulted Larrivee, Veneziano, and Cordaro to gain a better understanding of the clinical program's functioning.  He concluded that Shocrylas had not complied with the requirements in her post-midterm intervention plan, and that, on several occasions, she had failed to follow clinic program rules.

[13] Shocrylas contends that in his letter explaining the reasons for denying her appeal, he accused her of withholding certain information from him, but has since conceded that she did not do so.  She also contends that White's pre-existing malice towards her is reflected in a conversation she had with him in which he complained that her six-year-old son had been rude to him when he called her home, and that because of that he refused to return any of her phone calls.

Shocrylas appealed White's decision to Caruso, the Vice-President of Academic Affairs. On May 3, she met with Caruso for approximately an hour. Her husband and Samar were again present as observers. Again, she alleged that her grades were unfair.[14]

On May 23, Caruso informed Shocrylas by letter that he was denying her appeal. She contends that Caruso simply met with Larrivee, Veneziano, and Cordaro, took them at their word that the grades were fair, did not do any independent investigation, and "rubber-stamped" their decisions. (Pl. Opp. Mem. at 14).[15]

In May, White called a meeting of the Graduate Council to consider Shocrylas's appeal of her dismissal from the program. Because the academic year had already ended, a special meeting of the Council had to be called, and several of the members of the council were unable to attend. White and Larrivee, however, attended. The Council voted to reject the appeal.[16] Shocrylas contends that because of their irrational dislike of Shocrylas, White and Larrivee lobbied the other members to vote against her appeal. She further contends that three other students who had been dismissed from the program appealed their dismissal and were reinstated by the Graduate Council.

---

[14] According to Caruso, Shocrylas claimed that various members of the department faculty were "out to get her" because she was an older student, and that her instructors did not properly credit her life experience. She also gave Caruso written materials that she says supported her appeal. However, Caruso contends that when asked, she was unable to articulate the manner in which her grades did not accurately reflect her work.

[15] According to Caruso, he met with Larrivee, Veneziano, and Cordaro after the meeting. He says he also reviewed the clinical policy, the intervention plan, and Shocrylas's transcript and WPACC assessments. He concluded that Shocrylas had misconstrued her role as the student, misunderstood Cordaro's role as the licensed clinician, refused to follow Cordaro's instructions, and had not respected clinical boundaries.

[16] The Council consists of eight members. Plaintiff contends that four of the eight were in attendance, and voted 3-1 to reject her appeal. Defendants contend that five council members were in attendance, and that the vote was 4-1.

## II.  **Procedural Background**

On December 18, 2006, Shocrylas filed a complaint against Worcester State College.  On May 1, 2007, she amended her complaint, adding claims against four individual defendants, David Caruso, William White, Linda Larrivee, and Lee Cordaro.  The amended complaint contains eight counts.  Counts 1 through 5 are brought against WSC (Count 1), Caruso (Count 2), White (Count 3), Larrivee (Count 4), and Cordaro (Count 5) pursuant to 42 U.S.C. § 1983, and allege violations of plaintiff's due process rights.  Counts 6 and 7 are brought against WSC and allege breach of contract, and breach of the covenant of good faith and fair dealing.  Count 8 is brought against Caruso, White, Larrivee, and Cordaro, and alleges interference with contractual and business relations.

The amended complaint contends that defendants denied plaintiff a fair opportunity to earn her degree by unfairly and arbitrarily assigning her unsatisfactory grades on her clinical work and maliciously dismissing her from the program based on impermissible and non-academic motivations.  Shocrylas seeks reinstatement in WSC's graduate program in speech language pathology as well as compensatory and punitive damages.

## III.  **Analysis**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

A.     **Fourteenth Amendment Claims (Counts 2-5)**

To establish a claim pursuant to § 1983, a plaintiff must show that she was deprived of a right, immunity, or privilege secured by the Constitution or laws of the United States by a person acting under color of state law. *Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir. 1991). It is not disputed that all defendants, as employees of a state college, were acting under color of state law. The dispute concerns whether plaintiff has established a constitutional violation.

The complaint asserts that each defendant deprived her of her "right to due process guaranteed by the Constitution of the United States." (Am. Compl. ¶¶ 34, 41, 47, 53).[17] In her response to defendants' motion for summary judgment, plaintiff relies exclusively on a theory of substantive due process under a "shock the conscience" theory. (Pl. Opp. Mem. at 10-19). In order to establish such a claim, plaintiff must prove that she was deprived of an established life, liberty, or property interest, and that such deprivation occurred through governmental action that shocked the conscience. *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008); *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006).

1.     **The Property Interest at Stake**

Plaintiff contends that she has a "property interest in continuing her education at WSC." (Pl. Opp. Mem. at 11). The contours of that property interest, according to plaintiff, are established by "clear judicial recognition" and the terms of the WSC Clinic Manual and the Graduate Student Handbook. *(Id.)*.

---

[17] The Fourteenth Amendment provides that no one acting under color of state law may "deprive any person of life, liberty, or property, without due process of law." *See* U.S. CONST. AMEND. 14, §1.

Property interests, within the meaning of the Due Process Clause, are generally created by state law. *See Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 216 (D. Mass. 2005). Plaintiff has cited no case holding that a student has a constitutionally protected property interest in a graduate school education. Instead, the courts that have considered the due process implications of a dismissal from graduate school have generally assumed, for the sake of argument, that such an interest exists, and have gone on to hold that the requirements of due process were satisfied. *See, e.g., Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222 (1985) (assuming existence of property right in continued medical school enrollment); *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84-85 (1978) (same); *Hennessy v. City of Melrose*, 194 F.3d 237, 249-50 (1st Cir. 1999) (assuming existence of property right in completing teacher certification program); *Bell v. Ohio State Univ.*, 351 F.3d 240, 249 (6th Cir. 2003) (assuming existence of property right in continued medical school enrollment).

This Court will take a similar approach, and will assume, without deciding, that plaintiff had a constitutionally protected property interest in her continued enrollment in the SLP program at WSC. The question then becomes whether the requirements of due process were satisfied.

### 2. Whether Defendants' Conduct "Shocks the Conscience"

As noted, plaintiff's constitutional claims are based solely on substantive due process. The interests protected by substantive due process include freedom from government actions that "shock the conscience." *Clark*, 514 F.3d at 112. To show that government conduct "shocks the conscience" generally requires a showing that the conduct maliciously harmed the plaintiff without any intended benefit to a justifiable government interest. *See McConkie v. Nichols*, 446 F.3d 258,

261 (1st Cir. 2006). Furthermore, "[c]onscience-shocking conduct usually entails physical or psychological abuse." *Id.*

Plaintiff's substantive due process arguments are based on the following allegations, which she contends together add up to conduct that "shocks the conscience": (1) defendants based their grading decisions on personal animus; (2) defendants violated school policies in dismissing her from the program; (3) defendants treated her differently from other similarly-situated students in denying her appeal of her dismissal;[18] (4) the investigations by Larrivee, White, and Caruso were mere shams, intended to give the appearance of due process; and (5) defendants "consciously disregarded" her "strong academic record."

In substance, plaintiff's claims raise two issues. First, plaintiff seeks in substance to have this Court review and reverse decisions about her academic performance in a graduate-level program. She contends that defendants based their decisions regarding her grades and her dismissal from the SLP program on their personal hostility toward her, and not on their professional judgment. *See Ewing*, 474 U.S. at 225 ("When judges are asked to review the substance of a genuinely academic decision . . ., they should show great respect for the faculty's professional judgement. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.") (footnote omitted). The Supreme Court has

---

[18] Plaintiff does not allege an equal protection violation. She submitted three pages of evidence suggesting that three other students had been reinstated to the graduate program by the Graduate Council. There is no evidence, however, as to why those students had been initially dismissed, or whether the dismissal had to do with poor grades in the clinical program. Indeed, one of the students was apparently reinstated because she had indicated that she no longer required certain disability accommodations that she had previously requested. Another was reinstated on condition that she repeat a certain class (not a clinical placement) and maintain a minimum 3.0 grade point average. The third student does not appear to have been enrolled in the SLP program at all.

13

cautioned, however, that federal courts "are particularly ill-equipped to evaluate academic performance." *Horowitz*, 435 U.S. at 92.[19]  As the Court observed in *Ewing*, 474 U.S. at 226:

> [The Court is reluctant] to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom, a special concern of the First Amendment.  If a federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies, far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decision that require an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial or administrative decision-making.

(footnote, citations, and internal quotations omitted).

This Court is likewise poorly suited to review grading decisions made by graduate-level instructors in order to ascertain what a "fair" grade might have been.  Nor is it a simple task to determine where "professional judgment" leaves off and "personal animus" begins—particularly in a clinical setting where the personal attributes of the student (such as her willingness to accept criticism and direction from others) may play a significant role.  In any event, the Court has reviewed the record here in the light most favorable to the plaintiff, and has found nothing to suggest a "substantial departure from accepted academic norms."  *See Ewing*, 474 U.S. at 225.[20]

---

[19]  The fact that the dispute concerns plaintiff's performance in a clinical setting, rather than a classroom setting, is not significant.  As Justice Powell noted in his concurrence in *Horowitz*:

> It is well to bear in mind that respondent was attending a medical school where competence in clinical courses is as much of a prerequisite to graduation as satisfactory grades in other courses.  Respondent was dismissed because she was as deficient in her clinical work as she was proficient in the "book-learning" portion of the curriculum.  Evaluation of her performance in the former area is no less an "academic" judgment because it involves observation of her skills and techniques in actual conditions of practice, rather than assigning a grade to her written answers on an essay question.

435 U.S. at 95 (footnotes omitted).

[20]  The Court notes that plaintiff is not simply attempting to prove that a single individual disliked her, or harbored a grudge against her, and therefore destroyed her academic career.  Instead, she contends that multiple

It is not enough simply to establish that decisions might reasonably have come out a different way, or that her situation might have been handled with greater tact or diplomacy. Plaintiff must show that the conduct of defendants "shocked the conscience," and that she has been unable to do.

The other basic contention asserted by plaintiff is that defendants misinterpreted the policies in the SLP manual and incorrectly and unfairly applied them to dismiss her from the program. As noted above, the manual provides that "[i]f the student fails a second clinical practicum experience, no additional practicum will be assigned." In substance, plaintiff contends that she should not have been dismissed after failing two clinical placements in one semester, as opposed to failing single placements in successive semesters. Plaintiff's interpretation is not unreasonable, but neither is that of the defendants; the manual is subject to at least two reasonable interpretations. And even if plaintiff's interpretation is correct, defendants' interpretation is not so far-fetched or unreasonable as to "shock the conscience."

Plaintiff cites *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005), for the proposition that "where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to shock the conscience." She argues that over the course of the second half of the semester, Cordaro had the opportunity to reflect on the evidence and make a reasoned decision about plaintiff's grades, but instead allowed her personal dislike of the plaintiff to prevail. She also contends that Caruso, White, and Larrivee had the opportunity to reflect on the evidence she presented to them at the hearings, and to make a rational decision to uphold her appeal.

---

actors at the university, at various levels, were hostile to her. She thus seeks to have the Court overturn what was, in substance, a consensus academic decision.

In *Rivera*, the plaintiff's fifteen year-old daughter had witnessed a murder. The police and prosecutors subpoenaed the daughter to testify against the defendant, but the daughter was murdered just before the trial by the half-brother of the defendant against whom she was to testify. *Id*. at 32. Despite having told the officers of the several death threats the daughter had received over the period of several months between the incident and the scheduled trial, and despite the officers' promise to protect her, the officers did not put the daughter in a witness protection program or provide her with a police escort. She was murdered in front of her own home. *Id*. at 30-32. The *Rivera* court found that the conduct of the police officers and prosecutors involved in the case did *not* shock the conscience, even though there was ample time for reflection (and perhaps reasoned action to protect) in the several months between the initial death threats and the daughter's eventual murder. Compared to the death of an innocent fifteen-year-old girl, deliberate indifference to the fairness of the grades given to a graduate student cannot qualify as "conscience-shocking" within the meaning of the Due Process Clause.

### 3. **Qualified Immunity**

Defendants further argue that they cannot be liable for a substantive due process violation because they are entitled to qualified immunity.

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *See Davis v. Scherer*, 468 U.S. 183, 194 (1984). The question is whether the constitutional right at issue was

16

"clearly established" at the time of defendant's alleged violation. *See Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).[21]

As discussed above, neither the Supreme Court nor the First Circuit has decided whether there is a protected property interest in graduate education from a public institution. Therefore, it cannot be said that a graduate student's property interest in education at a public institution was "clearly established" within the meaning of *Harlow* or *Pearson*. Because it is not clearly established that a student has a constitutionally protected interest in her graduate education, a reasonable person might have, in good faith, deprived a student of that interest without realizing that there were due process implications. Similarly, the right to be free from unfair grading, or the right to a favorable interpretation in the SLP program manual, has not been clearly established. Indeed, plaintiff has cited no case directly on point, much less authority clearly establishing a constitutional violation.

Defendants are therefore entitled to qualified immunity on the plaintiff's due process claims, even if a substantive due process claim had been established. The defendants' motion for summary judgment will therefore be granted as to Counts 2, 3, 4, and 5.

### B. Intentional Interference with Contractual and Business Relations (Count 8)

The complaint alleges a claim under state law for intentional interference with contractual or business relations. In substance, plaintiff alleges that she had a contractual relationship with WSC, that the defendants were aware of the relationship, and that they interfered with it with an

---

[21] Where the issue of whether defendants are entitled to qualified immunity turns on whether the state of the law made it clear that the alleged conduct would violate plaintiff's constitutional rights, qualified immunity is a question of law, and therefore appropriate for summary judgment. *See Ahern v. O'Donnell*, 109 F.3d 809, 820 (1st Cir. 1997).

improper motive and by improper means. Plaintiff did not, however, address the claim in her opposition to defendants' motion for summary judgment, and accordingly it is unclear what evidence she contends supports this claim.

To succeed on a claim for interference with contractual or business relations, the plaintiff must prove that (1) she had a contractual or business relationship with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff was harmed or lost an advantage as a direct result of defendants' conduct. *See Kurker v. Hill*, 44 Mass. App. Ct. 184, 191 (1998).

Defendants contend that they are protected by qualified immunity under Massachusetts law. The Massachusetts Tort Claims Act grants state employees immunity for their negligent acts. *See* Mass. Gen. Laws ch. 258, § 2. However, the Act does not immunize state employees from liability for intentional torts, including specifically "interference with advantageous relations or interference with contractual relations." *See* Mass. Gen. Laws ch. 258, § 10(c). Other than a single unreported trial court decision, defendants have cited to no Massachusetts authority suggesting that the doctrine of qualified immunity should apply to such claims.[22]

---

[22] Defendants also cite *Lynch v. City of Boston*, 989 F. Supp. 275 (D. Mass. 1997). There, however, the court only analyzed the qualified immunity issue with respect to a First Amendment claim, and upheld a jury verdict for the plaintiff on the intentional interference claim without suggesting that qualified immunity would apply to that claim. *Id.* at 298.

At least one other federal decision has suggested that qualified immunity may apply to claims under Massachusetts law. *See, Thore v. Howe*, 466 F.3d 173, 175 (1st Cir. 2006) ("[a]s a result, the [district] court reasoned, Thore's § 1983 excessive force and state law assault and battery claims failed to overcome Officer Howe's qualified immunity"). However, the district court in *Thore* did not actually conclude that the doctrine of qualified immunity applied to the state law claim of assault and battery, only the § 1983 claim. *Thore v. Howe*, No. 03-11999, slip op. at 10 (D. Mass. Feb. 27, 2006).

The Court therefore turns to the merits of the claim. The relationship between a student and a college is "essentially contractual in nature." *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998); *see also Thornton v. Harvard Univ.*, 2 F. Supp. 2d 89, 93 (D. Mass. 1998). Presumably, therefore, it is possible for someone to interfere tortiously with that relationship. Here, however, all of the defendants are faculty members and administrators of the college, and thus agents of the institution, as well as state employees. They are thus accused of interfering with the contract of their employer, not a third party. Plaintiff has cited no authority suggesting that college faculty and administrators could be found liable under such circumstances.[23]

Under Massachusetts law, corporate officials acting within the scope of their employment responsibilities cannot be held liable for intentional interference with a contract involving the corporation unless they do so with "actual malice"—that is, a spiteful, malignant purpose, unrelated to the corporate interest. *Blackstone v. Cashman*, 448 Mass. 255, 260-61 (2007). The purpose of the rule is to permit corporate officials freedom of action without being unduly curtailed by fear of personal liability. *Id.* The plaintiff has the burden of proving "actual malice"; it is not a defense that must be proved by the defendant. *Id.* at 261.

At a minimum, it appears likely that the courts of Massachusetts would apply a similar standard in this context. Indeed, in light of the concerns regarding judicial interference in academic decisions that have been repeatedly expressed by other courts, it is not unlikely that Massachusetts would adopt a very high threshold for recovery against faculty members for academic decisions. *See, e.g., Horowitz*, 435 U.S. at 92; *Ewing*, 474 U.S. at 226. In any event,

---

[23] Defendants argue that insofar as the claims are brought against the defendants in their official capacity, the claims are barred by the Eleventh Amendment. However, it is clear from the amended complaint that the claims against Caruso, White, Larrivee, and Cordaro are brought against them in their individual capacities.

plaintiff here has not submitted sufficient evidence from which a reasonable jury could conclude that defendants acted with actual malice, unrelated to legitimate academic goals or processes. Summary judgment will therefore be granted as to Count 8.

## IV.     Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor  
F. Dennis Saylor IV  
United States District Judge

Dated:  August 7, 2009